IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **JONES LANG LASALLE BROKERAGE, INC.,** | **CIVIL ACTION** |
| **Plaintiff,** | |
| v. | |
| **LIBERTY 1100 VA DR LLC,** | **NO. 24CV1175** |
| **Defendant.** | |

**MEMORANDUM OPINION**

This breach of contract action concerns a fight over brokerage commissions. Pursuant to an agreement between the parties, Plaintiff Jones Lang Lasalle Brokerage, Inc. ("Jones Lang Lasalle") serves as the exclusive broker responsible for subleasing a plot of real, commercial property in Fort Washington, Pennsylvania (the "Listed Property") on which Defendant Liberty 1100 WA Drive LLC ("Liberty") is the tenant. Here, while Jones Lang Lasalle acknowledges that Liberty has paid half of what it believes it is owed in commissions under their agreement it maintains it is still owed the other half. Liberty disagrees. The dispute turns on the interpretation of certain terms in their agreement. Plaintiff, Jones Lang Lasalle, argues that the terms unambiguously entitle it to its commission payments, and so has moved for summary judgment pursuant to Federal Rule of Civil Procedure 56.[1]

I.  **FACTUAL BACKGROUND**

Except as otherwise noted, the following facts are not in genuine dispute.

---

[1] A party is entitled to summary judgment if it shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

1

In August 2021, Liberty and Jones Lang Lasalle signed an Exclusive Authorization to Lease the Property (the "Brokerage Agreement") whereby Jones Lang Lasalle became Liberty's "sole and exclusive agent" "for the purpose of leasing the Listed Property" and would earn a commission for helping Liberty sublease the Listed Property. Paragraph 7 of the Brokerage Agreement provides:

> [T]he Commission shall be earned by Broker for services rendered if:
>
> (a) <u>During the Term</u>: All or some portion of the Listed Property is leased to a satisfactory tenant pursuant to a fully executed lease first *executed and effective* during the Term . . .

Brokerage Agreement ¶ 7 (emphasis added). The dispute between the parties focuses on the import of Paragraph 7's terms, "executed" and "effective," as they concern Liberty's sublease of a portion of the Listed Property to NewRez, LLC ("New Rez").

By way of background, years before the parties here signed the Brokerage Agreement, Liberty subleased a portion of the Listed Property to New Rez (the "First Sublease"). Towards the end of the First Sublease, New Rez was looking to downsize and improve its rented space. So, Liberty and NewRez entered into a new agreement which downsized significantly NewRez' subleased portion of the Listed Property (the "Second Sublease").

The Second Sublease is at the heart of the parties' disagreement. While the improvements were being made to its subleased portion of the property, NewRez vacated most of the newly sublet property planning to retake possession when the improvements were made. Although the Second Sublease provides that the commencement date of the sublease is January 1, 2023, NewRez has, as of now, not paid any rent under the Second Sublease and has moved completely off the property.

With that background, we turn now to the matter in dispute here. Shortly after the

2

commencement date of the Second Sublease, Jones Lang Lasalle sent Liberty an invoice, billing Liberty for a commission in the amount of $483,291.03 to be paid by the end of January 2023. Liberty paid the first half of the commission in May 2023. But it is refusing to pay the other half. By way of this lawsuit, Jones Lang Lasalle is seeking to recover the balance. The crux of the parties' argument is whether the Second Sublease is "executed and effective". Jones Lang LaSalle argues that it is (which means it is owed its commission). Although all agree that the Second Sublease was "executed," Liberty points to the requirement set forth in Paragraph 7 of the Brokerage Agreement that provides commissions are due only upon "a fully executed lease" which is also "*effective*" (emphasis added). It counters that the Second Sublease was not "effective" because New Rez has not paid rent and has not taken possession of the property. What that word—"effective"—means in Paragraph 7 is the beginning and end of this dispute.

## II.   DISCUSSION

In Pennsylvania, a breach of contract claim requires the plaintiff to show the existence of a contract, a breach of a duty imposed by the contract, and damages. *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). The only element at issue here is breach: whether Liberty breached its duty to Jones Lang Lasalle pursuant to the Brokerage Agreement by not paying the full commission. That question turns on the interpretation of the word "effective" in Paragraph 7.

In Pennsylvania, "[t]he paramount goal of contract interpretation is to determine the intent of the parties." *Baldwin v. Univ. of Pittsburgh Med. Ctr.*, 636 F.3d 69, 75 (3d Cir. 2011) (citation omitted). In determining intent, "all provisions in the agreement will be construed together and each will be given effect. [Pennsylvania courts] will not interpret one provision of a contract in a manner which results in another portion being annulled." *LJL Transp., Inc. v. Pilot*

*Air Freight Corp.*, 962 A.2d 639, 647-48 (Pa. 2009) (citations omitted). In determining the meaning of a contract's specific provisions, Pennsylvania courts conduct the analysis as follows:

> When the words of a contract are clear and unambiguous, the intent is to be found only in the express language of the agreement. Clear contractual terms that are capable of one reasonable interpretation must be given effect without reference to matters outside the contract. Where the contract terms are ambiguous and susceptible of more than one reasonable interpretation, however, the court is free to receive extrinsic evidence, *i.e.*, parol evidence, to resolve the ambiguity. A contract will be found to be ambiguous . . . if, and only if, it is reasonably or fairly susceptible of different constructions and is capable of being understood in more senses than one and is obscure in meaning through indefiniteness of expression or has a double meaning. A contract is not ambiguous if the court can determine its meaning without any guide other than a knowledge of the simple facts on which, from the nature of the language in general, its meaning depends; and a contract is not rendered ambiguous by the mere fact that the parties do not agree on the proper construction.

*Krizovensky v. Krizovensky*, 624 A.2d 638, 642 (Pa. Super. 1993) (internal quotation marks and citations omitted) (quoted at length in *In Re Old Summit Mfg., LLC*, 523 F.3d 134, 137-38 (3d Cir. 2008)). "Wherever reasonable, the manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other and with any relevant course of performance, course of dealing, or usage of trade." *Kamco Indus. Sales, Inc. v. Lovejoy, Inc.*, 779 F.Supp.2d 416, 427 (quoting *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1193 (Pa. 2001) (internal citations omitted)).

Before delving into the questions of whether the meaning of the terms ""executed and effective" in Paragraph 7 are unambiguous, a little side shuffle is necessary to address Liberty's argument that, while the Second Sublease was properly executed, the agreement was not "effective". As Liberty sees it, the term "effective" in Paragraph 7 must do some work and, if it does, then Paragraph 7 must be ambiguous. Specifically, it suggests that the sublease could

become "effective" at various points, *e.g.* on the date that it was executed, or on the date that the tenant takes occupancy of the property and begins paying rent, neither of which NewRez has done.

Liberty's argument relies on reference to numerous extrinsic facts. It first highlights that in May 2023—months after NewRez and Liberty executed the Second Sublease and Jones Lang Lasalle demanded payment—Liberty negotiated with Jones Lang Lasalle to pay half of its commission immediately, and delay paying the second half of the commission until a later date. Liberty contends that the second payment was negotiated to be due on the same day upon which NewRez was originally supposed to retake possession. As Liberty sees it, such renegotiation means the parties have always intended for full payment to occur on the date that NewRez takes possession.

Liberty also calls attention to its dispute with NewRez regarding the Listed Property's improvements, which occurred after the Second Sublease was executed. As Liberty reports, it resolved that particular dispute with NewRez by amending the Second Sublease, which now states that the Second Sublease will commence upon substantial completion of the Listed Property's improvements. According to Liberty, once the improvements are finished and NewRez moves in, then the Second Sublease will become effective.[2]

But, by injecting extrinsic evidence into the discussion at this juncture, Liberty puts the cart before the horse. In determining, as a threshold matter, whether a contract term is unambiguous one looks only to "the language of the contract . . . and . . . not . . . to extrinsic aids or evidence." *See* Baldwin, 636 at 76 (internal citations and quotations omitted). Only if the

---

[2] In support of such contentions, Liberty does not provide the amended Second Sublease. Rather, it relies on a "verification" from its own employee, which was signed long after discovery closed.

Court determines, on a review of the language, *Commonwealth by Shapiro v. UPMC*, 208 A.3d 898, 911-12 (Pa. 2019) (looking to the language of the contract itself, other terms of the contract, and dictionary definitions), that a contract term is ambiguous does the matter go to the jury to decide with the help of extrinsic aids and evidence how it should be read. *Id.* at 910 ("While unambiguous contracts are interpreted by the court as a matter of law, ambiguous writings are interpreted by the finder of fact.") (internal citations omitted).

Jones Lang Lasalle focuses solely on the terms found in the Brokerage Agreement. It assumes, without much supporting argument for such assumption, that the terms "executed and "effective" are coextensive. It emphasizes that the Brokerage Agreement only required it to "take and pursue in good faith and with due diligence any and all actions reasonably necessary to *lease* the Listed Property to satisfactory tenants." Brokerage Agreement ¶ 3(a) (emphasis added). According to it, once that occurred—*i.e* once NewRez executed its agreement with Liberty—the Listed Property was leased and Liberty's duty to pay the full commission was triggered.

Although Jones Lang Lasalle properly draws the Court's attention only to terms found within the Brokerage Agreement to determine the question of ambiguity—its proffered interpretation of Paragraph 7 must also be rejected. First, a court may "not interpret one provision of a contract in a manner which results in another portion being annulled." *LJL Transp.*, 962 A.2d at 648. And to adopt Jones Lang Lasalle's argument that the term "effective" really just means "executed" would render the word "effective" superfluous, a result which is not countenanced under Pennsylvania law. *Id.*

Second, there is language in the Brokerage Agreement itself which indicates that the parties did not intend to treat the execution and effective dates of a sublease as equivalents.

6

Specifically, compare the inclusion of the word "effective" in the introductory paragraph of the Brokerage Agreement which reads in relevant part "(this 'Agreement') is made *effective* as of July 29, 2021", *emphasis added*, to its signature block which reads that the parties "executed" the agreement on August 24, 2021.  In other words, the Brokerage Agreement uses the terms "effective" and "executed" to refer to two potentially different dates.  Such usage—that execution and effectiveness may occur on different dates—is "objective evidence of the parties' intent" to treat execution and effectiveness as separate events, too, when using the terms in Paragraph 7 to define whether a sublease like the Second Sublease here would warrant a commission.  *Great N. Ins. Co. v. ADT Servs., Inc.*, 517 F.Supp.2d 723, 741 (W.D. Pa. 2007) (using the parties' prior course of dealing to interpret the intent of the parties in subsequent agreements).  Without a contrary definition in the Brokerage Agreement or competing evidence of prior intent, it would be unreasonable to adopt an interpretation of Paragraph 7 that uses the terms as conclusively occurring on the same date, so Jones Lang Lasalle's arguments must be rejected, too. [3]

While both parties' arguments miss the mark, a review of the Brokerage Agreements leads to the conclusion that the term "effective" in the Brokerage Agreement's is unambiguous. Because "manifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other," *Kamco Indus. Sales, Inc.*, 779 F.Supp.2d at 427 (internal citations and quotations omitted), looking to the Brokerage Agreement's other uses of the word "effective" informs the meaning of the term as it is used in Paragraph 7.

---

[3] To be sure, the execution of any sublease, including the Second Sublease here, *could* be on the same day that the sublease became effective, but Jones Lang Lasalle is incorrect in asserting that the execution of the Second Sublease necessarily satisfies both of the Paragraph's requirements that a sublease be executed *and* become effective to trigger Jones Lang Lasalle's commission.

For example, Paragraph 9 of the Brokerage Agreement uses the term "effective" as follows:

> This Agreement shall become *effective* as of 12:01 a.m. Eastern time on the date set forth in the opening paragraph of this Agreement and, subject to Section 10 hereof, shall *remain in full force* until 11:59 p.m. (Eastern time) on the date that is twelve (12) months thereafter (the "Term"). The Agreement will continue year to year unless otherwise terminated in accordance with Section 10 of this Agreement.

Brokerage Agreement at ¶ 9 (emphasis added). So, by its own terms, the Brokerage Agreement uses the word "effective" to describe the time period during which the Brokerage Agreement binds the parties. Once becoming "effective," the Brokerage Agreement will "remain in full force," implying that the effective date is the date that the Brokerage Agreement *begins* to apply in full force. That definition comports with Black's Law Dictionary, which defines the term effective as "in operation at a given time," and notes that a "contract is often said to be effective beginning (and perhaps ending) at a designated time." *Effective*, *Black's Law Dictionary* (12th ed. 2024).

Because the term "effective," as used in Paragraph 9 of the Brokerage Agreement, refers to when the Brokerage Agreement is in full force, that usage reveals what the parties intended the word "effective" to mean in describing a sublease like the Second Sublease here under Paragraph 7. *Kamco Indus. Sales, Inc.*, 779 F.Supp.2d at 427 ("[M]anifestations of intention of the parties to a promise or agreement are interpreted as consistent with each other") (internal citations and quotations omitted). The word "effective," used in Paragraph 7 of the Brokerage Agreement, describes when a sublease, such as the Second Sublease here, is in full force. That is the term's only reasonable meaning, and therefore, the term is unambiguous. *Krizovensky*, 624 A.2d at 642 (holding that a contract is ambiguous "if, and only if, it is reasonably or fairly susceptible" to multiple constructions).

Because the term "effective," as used in Paragraph 7, is unambiguous, the term must be "given effect." *Id.* Thus, all that is left to decide is whether the Second Sublease was in full force within the Term of the Brokerage Agreement, thereby entitling Jones Lang Lasalle to a commission. In answering that question, the pertinent date to be consider is found in document's Basic Lease Terms and Definitions which provide for a "Commencement Date: January 1, 2023." That term—"Commencement Date"—is explored further in Paragraph 4, entitled "Term; Possession", which provides in pertinent part:

> The Term of this Lease shall commence on the Commencement Date and shall end on the Expiration Date, unless sooner terminated in accordance with this Lease . . .

Second Sublease ¶ 4. In other words, the Second Sublease is in full force—it is effective—from the Commencement Date—January 1, 2023, Second Sublease ¶ 1(e)—to the Expiration Date, September 30, 2033, Second Sublease ¶ 1(f).

In that it is unambiguous that the Second Sublease became "effective" on January 1, 2023, a date which falls within the Brokerage Agreement's term, Jones Lang Lasalle is entitled to its full commission and its Motion for Summary Judgment shall be granted.

An appropriate order follows.

                                        **BY THE COURT:**

                                        **S/ WENDY BEETLESTONE**

                                        _____

                                        **WENDY BEETLESTONE, J.**